[Cite as *Banker v. State Medical Bd.*, 2024-Ohio-6009.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Wade L. Banker, M.D., | : | |
| Appellant, | : | |
| | : | No. 23AP-614 |
| v. | : | (C.P.C. No. 23CV-3053) |
| State Medical Board of Ohio, | : | (REGULAR CALENDAR) |
| Appellee. | : | |

D E C I S I O N

Rendered on December 26, 2024

**On brief:** *Dinsmore & Sholl*, *LLP*, and *Gregory A. Tapocsi*, *LaTawnda N. Moore*, and *Eric J. Plinke*, for appellant. **Argued:** *Eric J. Plinke*.

**On brief:** *Dave Yost*, Attorney General, and *Kyle C. Wilcox*, *Melinda R. Snyder*, and *James T. Wakley*, for appellee. **Argued:** *Kyle C. Wilcox*.

APPEAL from the Franklin County Court of Common Pleas

BEATTY BLUNT, J.

{¶ 1} Appellant, Wade D. Banker, M.D., appeals the judgment of the Franklin County Court of Common Pleas, affirming the order of the State Medical Board of Ohio ("the Board") that permanently revoked Banker's license to practice medicine in Ohio. Banker argues that the trial court erred by affirming the Board's order based on charges that were not included in his notice of opportunity for hearing, and by permitting the Board to "wrongful[ly] conver[t] * * * an expert's insufficient written report" into affirmative evidence of disciplinary violations. (Brief of Appellant at 9.)

{¶ 2} On December 9, 2020, the Board sent certified mail notice to Banker that it proposed to act against his license based on inadequate and inappropriate prescribing, failure to provide appropriate treatment, and having inadequate documentation. The

notice described allegations regarding 15 different patients treated by Banker between June 2014 and May 2018, all of whom were treated with either surgical cosmetic procedures or hormone replacement therapies. In particular, the Board's notice of hearing described allegations including lack of proper documentation of diagnosis and treatment, improper diagnosis and treatment, and incorrect and unwarranted prescription of hormone therapies to 9 separate patients, and inappropriate documentation of aesthetic surgical procedures, inappropriate management of conditions, and inappropriate aesthetic surgical care to 6 other patients. (Record of Proceedings, State's Ex. 23a; Decision and Jgmt. Entry Affirming the Order of the State Med. Bd. at 1.)

{¶ 3} Banker had become a board-certified radiologist in 2002, and practiced that specific specialty until 2014, when he decided to open a private aesthetic practice. The allegations against Banker were that he provided inappropriate monitoring of his patients' conditions, that he inappropriately or inadequately monitored his patients' medications, that he failed to provide appropriate care and treatment to his patients, that he inappropriately prescribed medications to patients, that he maintained inadequate and/or incomplete documentation regarding his patients, and that he departed from the "minimal standards of care of similar practitioners under the same or similar circumstances." R.C. 4731.22(B)(6).

{¶ 4} The administrative hearing on the charges against Banker lasted six days, and the record of the hearing comprises over one thousand transcript pages. In July 2022, the Board's hearing officer issued a 158-page report and recommendation, including detailed factfinding and specific citations to the hearing transcript. (*See generally* Notice of Appeal, Ex. A.) The hearing officer found: Banker practiced radiology and/or interventional radiology from 2001 until 2014 (*id.* at ¶ 16); Banker has never been board-certified in surgery, endocrinology, or any other field except radiology (*id.* at ¶ 17); since 2015, he has had no affiliation with any hospitals or medical schools (*id.* at ¶ 14); he spent about $1 million to start his new aesthetics practice, which included about $250,000 to purchase a "smart liposuction" machine (*id.* at ¶ 18, 20); he had never performed liposuction before purchasing the machine and had learned how to use the machine at a 2-day course in February 2014 (*id.* at ¶ 22, 24); he learned to do local anesthesia breast augmentations during a "three or four-day weekend" in November 2014 (*id.* at ¶ 29); and he had no other

training in such surgeries before he began offering "awake breast augmentations" at his clinic in 2016 (*id.* at ¶ 31). In 2021, he took a 2-day "awake 'tummy tuck' " course and began performing those procedures, as well. *Id.* at ¶ 36.

{¶ 5} Banker also began offering hormone replacement therapy ("HRT") to both men and women in 2016. *Id.* at ¶ 37. He had no formal training in endocrinology beyond his medical school courses but went to a training center for HRT for one "very long day" in February 2016, where he reviewed the history of HRT, read journal articles, and was trained in dosing. *Id.* at ¶ 40.

{¶ 6} Banker admitted that some of his prescriptions to his HRT patients were against the Board's rules, specifically that he inappropriately prescribed phentermine for four of the patients in this case, and he stated that while he "did not know the rules at that time" (*id.* at ¶ 53), " 'no harm was done, the patients did well, [and] they were all happy with their treatment.' " (*Id.*, quoting July 18, 2022 Tr. Vol. I at 139.) He also admitted that his documentation in all 15 cases in the citation, for both the surgical and the HRT patients, was "inadequate." *Id.* at ¶ 55. Although Banker denied his prescriptions of controlled weight loss drugs and testosterone to weight loss patients was below the standard of care, it is a violation of R.C. 4731.22(B)(2) and the Board's rules to prescribe some of these substances for weight loss, and Banker did admit this. *Id.* at ¶ 51.

{¶ 7} The hearing officer ultimately determined that:

> Patient 10 treated * * * regarding complaints related to facial aging. * * * [was] provided laser treatment and possibly liposuction of the neck * * *. Following the treatment, the patient was seen by another health care provider * * * and was sent to the emergency room where she was treated for a third degree burn of her neck. * * * [Dr. Banker] * * * failed to document the burn in the chart.

> Patient 13 * * * [was provided] a breast augmentation with silicone implants under local anesthesia. The first surgery was * * * aborted due to patient loss of consciousness and desaturation. The patient received mouth-to-mouth resuscitation during the desaturation. The patient also had a second procedure that was aborted due to possible lidocaine toxicity. The documentation was unclear as to whether the surgery was completed, and * * * Dr. Banker further failed to appropriately follow the patient post-operatively.

> Patient 14 treated * * * [for] a breast augmentation revision to remove saline implants and replace them with silicone

implants under local anesthesia. The documentation in the chart was unclear about the patient's past medical history and other pertinent medical issues, including any previous mammograms or history of breast cancer in the family. While the pictures show a deformity around the areola, that was not appropriately documented in the chart, and it is unclear if the deformity existed before the surgery, since the pictures in the chart are not dated.

Patient 1 treated * * * for complaints apparently related to hypogonadism and being overweight. In January 2017, the laboratory tests showed a low normal testosterone level of an unclear clinical significance, [but] the patient was given testosterone pellets. * * * Dr. Banker's office notes were inadequate, as no past medical history was recorded and he failed to perform, and/or document performing, an appropriate physical examination. Dr. Banker also failed to appropriately establish a diagnosis of hypogonadism, and he further failed to have sufficient testing conducted in order to establish an appropriate diagnosis and the cause of any symptoms or complaints. * * * [G]iven Dr. Banker's failure to appropriately establish a diagnosis, the use of the medications was not clinically indicated.

Patient 2 was treated for complaints apparently related to obesity and hypogonadism. When the patient was first seen * * *, Dr. Banker prescribed phentermine, but there was no formal note of a history, review of symptoms, recording of vital signs or physical examination. * * * Dr. Banker failed to do a formal workup to determine causes for obesity, and failed to monitor the side effects from phentermine. * * * Blood work done in June 2016 showed normal testosterone and normal estradiol levels, although the patient's symptoms remained the same. Dr. Banker's treatment for obesity and hypogonadism was based on incomplete information to establish appropriate diagnoses. * * * The overall documentation was incomplete, and given Dr. Banker's failure to appropriately establish diagnoses, the use of the medications was not clinically indicated.

Although there was inadequate documentation, Dr. Banker determined that [Patient 9] was a good patient for hormone replacement therapy (HRT) and prescribed testosterone pellets with anastrozole. During the patient's first office visit on or about June 21, 2016, Dr. Banker failed to document a history of present symptoms, past medical history, a review of symptoms, vital signs, or a physical exam. Sermorelin was added on or about June 8, 2017, and the patient remained on testosterone pellets until on or about October 20, 2017 when he

> was started on testosterone cypionate injections, 200 mg weekly.
>
> The patient's testosterone levels were measured on or about July 20, 2016 and were elevated. They continued to increase, and the levels were greatly elevated when measured on or about November 22, 2016. Dr. Banker failed to appropriately monitor the treatment or medications. The diagnosis of hypogonadism and subsequent treatment with HRT was inadequate, as the documentation in the chart indicated that it was based on clinical symptoms alone. In addition, the overall documentation was incomplete, and the use of the medications for unproven conditions was not appropriate.

*Id.* at 143, 146-48.

Based on the foregoing and other findings in the 158-page report and recommendation, the hearing officer recommended that Banker's license be indefinitely suspended with an opportunity to seek reinstatement on conditions, along with a 2-year probationary term on reinstatement. (*See generally* May 22, 2023 Notice of Appeal, Ex. A.)

{¶ 8}    But when reviewing the recommendations and the proposed discipline, and following personal testimony by Banker to the Board, the Board amended the sanction recommendation to state that Banker's license should be permanently revoked. *Id.* at 3. In justifying his own decision to reject the recommended sanction in favor of revocation, Board member Dr. Jonathan Feibel stated that:

> [T]his is one of the more egregious cases he has seen since joining the Board. It is not just one incident, but the totality of facts that worries Dr. Feibel, including the prescribing of controlled substances without following Board rules, lack of record-keeping, lack of documentation of complications, and performing procedures that Dr. Banker is not trained to do. Dr. Feibel stated that the public should not expect that from Ohio's physicians. The fact that Dr. Banker does not realize this causes Dr. Feibel to feel very uncomfortable with his continued practice. Dr. Feibel opined that a permanent limitation on Dr. Banker's license would not fix that fact that he does not realize what he did in the areas of plastic surgery and hormone replacement therapy (HRT) were wrong.
>
> Dr. Feibel noted the arguments that Dr. Banker took a two-day course in breast reconstruction and that he therefore should not be held to the same standard of care as a plastic surgeon who had trained for seven years. Dr. Banker had referred to having been in a general surgery residency, but that was for a very brief period of time and he is not well-trained in surgery.

Dr. Banker has had major complications and patients have suffered severe harm because he does not realize his limitations. Dr. Feibel commented that the pictures in the hearing record were horrible. Dr. Feibel likened this to someone claiming after a two-day course to be able to fix a femur fracture, something Dr. Feibel, an orthopedic surgeon, trained for five years to do.

(Apr. 12, 2023 State Med. Bd. of Ohio Meeting Minutes at 13.)

{¶ 9} The Board eventually voted 9-0-2 to "approve and confirm the Proposed Findings of Fact, Conclusions of Law, and Proposed Order, as amended, in the matter of Dr. Banker." *Id*. at 17 (motion to amend proposed order to include permanent revocation carried 8-1-2, with Dr. Michael Schottenstein dissenting and Drs. Mark Bechtel and Kim. G. Rothermel abstaining). Banker's license was therefore permanently revoked and a $3,500 fine was imposed.

{¶ 10} Banker appealed to the Franklin County Court of Common Pleas, which reviewed the record and Banker's 5 assigned errors to the Board's order. But the fundamental question before the trial court was whether the Board was permitted, based on the allegations made and the evidence admitted, to conclude that Banker was not competent to treat the 15 patients and perform the aesthetic procedures described in the notice. The trial court rejected all of Banker's arguments and affirmed the Board's decision.

{¶ 11} Banker now appeals to this court and asserts five assignments of error with the trial court's judgment:

> [I.] The Common Pleas Court committed legal error by affirming the Board's Order that was founded upon charges or reasons related to Dr. Banker's education, training, and experience which were not included in the Notice of Opportunity for Hearing.
>
> [II.] The Common Pleas Court committed legal error by affirming the Board's wrongful conversion with an expert's insufficient written report for procedural patients into affirmative evidence of a disciplinary violation contrary to the Supreme Court of Ohio's *Arlen* and *In re Williams* decisions.
>
> [III.] The Common Pleas Court abused of discretion in affirming the Board's Order in relation to procedural patients because there is no evidence to support the Board's findings of disciplinary violations, except for documentation matters which Dr. Banker readily admitted.

[IV.] The Common Pleas Court committed legal error in relation to hormone replacement therapy patients by affirming the Board's reliance upon the report and testimony of an expert that was not in accordance with the mandates of R.C. 4731.22(B)(6).

[V.] The Common Pleas Court committed legal error by affirming the Board's Order based on the Court's erroneous conclusion that Dr. Banker admitted his prescribing of hormone replacement therapy medications [to] patients fell below minimum standards of care.

Moreover, in his reply brief, Banker asserts—for the first time in this case—an additional assignment of error and argument:

Pursuant to the Supreme Court of Ohio's holding in the *TWISM* [*Ents., L.L.C. v. State Bd. of Registration for Professional Engineers & Surveyors*, 172 Ohio St.3d 225, 2022-Ohio-4677] decision, mandatory deference to the Board's interpretation of a statute or rule is improper.

(Appellant's Reply Brief at 5.)

{¶ 12} We begin our analysis of Banker's arguments by observing that when reviewing an order from the Board, a trial court is required to affirm the order if it is supported by reliable, probative, and substantial evidence, and is in accordance with law. R.C. 119.12(M). *See also Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621 (1995). But an appellate court's review is even more limited than that of the trial court—it is not the function of the appellate court to examine the evidence; rather, it is to determine only if the trial court has abused its discretion, and absent an abuse of discretion on the part of the trial court, a court of appeals may not substitute its judgment for that of either the Board or the trial court, but must instead affirm the trial court's judgment. *Id.* And in *Pons*, the Supreme Court of Ohio held that "when reviewing a medical board's order, courts must accord due deference to the board's interpretation of the technical and ethical requirements of its profession." *Id.*

The purpose of the General Assembly in providing for administrative hearings in particular fields was to facilitate such matters by placing the decision on facts with boards or commissions composed of [people] equipped with the necessary knowledge and experience pertaining to a particular field. * * * A medical disciplinary proceeding is a special statutory proceeding conducted by twelve persons, eight of whom are licensed physicians. R.C. 4731.01. *Thus, a majority*

> *of the board members possess the specialized knowledge needed to determine the acceptable standard of general medical practice. Hence, the medical board is quite capable of interpreting technical requirements of the medical field and quite capable of determining when conduct falls below the minimum standard of care.*

(Emphasis added.) (Internal quotations and citations omitted.) *Id.* at 621-23.

{¶ 13} As noted in his reply memorandum, Banker asserts a new assignment of error that, pursuant to *TWISM Ents., L.L.C. v. State Bd. of Registration for Professional Engineers & Surveyors*, 172 Ohio St.3d 225, 2022-Ohio-4677, the Board's "interpretation of the ethical and legal requirements of the medical profession" is not entitled to deference, and that the Board's conclusion that he violated R.C. 4731.22(B)(6), which authorizes discipline based on a "departure from, or a failure to conform to, minimal standards of care of similar practitioners under the same or similar circumstances," is incorrect. (Appellant's Reply Memo at 5.)

{¶ 14} This error is not properly before us pursuant to the Rules of Appellate Procedure, *see, e.g.*, *Cullinan v. Ohio Dept. of Job & Family Servs.*, 10th Dist. No. 15AP-390, 2016-Ohio-1083, ¶ 19, citing App.R. 16(C), but at any rate, it wholly lacks merit. *TWISM* is without application in this case because the courts have never been instructed to defer to the Board's interpretation of the law. Rather, the deference given to the Board is on the facts of the case, viewed in accordance with the special knowledge of the Board. *TWISM* rejects deference to agency interpretations of statutes and rules as a matter of separation of powers, because "[w]hen a court defers to an agency's interpretation of the law, it hands to the executive branch the judicial authority 'to say what the law is.' " *TWISM* at ¶ 34, quoting *State v. Parker*, 157 Ohio St.3d 460, 2019-Ohio-3848, ¶ 31. But here, Banker has not complained that Board has misinterpreted a statute or rule—rather, he complains that the Board should have no authority to determine whether the facts of his case met the acceptable standards of medical practice. *Compare id. with Pons* at 621 ("[W]hen reviewing a medical board's order, courts must accord due deference to the board's interpretation of the technical and ethical requirements of its profession."). This court has already rejected a similar attempt to shoehorn *TWISM* into an appeal from the Board. *See Yoonessi v. State Med. Bd. of Ohio,* 10th Dist. No. 23AP-160, 2024-Ohio-169, ¶ 5 ("The trial court did not defer to the [Board] on its interpretation of the law, and *TWISM*

does not reach so far as to restrict the [Board] from serving the precise function that the legislature created it to serve."). Banker's essential argument here is that *TWISM* outlawed all agency decision-making. Not so.

**{¶ 15}** Turning to Banker's remaining, correctly presented assignments of error, we observe that "this court has affirmed trial court decisions in several similar cases based largely on the simple determination that the trial court did not abuse its discretion in finding that [the Board's] decisions were supported by reliable, probative, and substantial evidence." *Id.* at ¶ 10. The same principle applies here.

**{¶ 16}** As to Banker's first assignment of error, the mere fact that the Board relied on very limited training for the procedures he performed does not create a violation of his R.C. 119.07 notice right to procedural due process. As we have observed, "due process is not violated unless the individual is actually disciplined for activities not mentioned in the hearing notice[, and] 'due process does not preclude a disciplinary body from considering uncharged misconduct in determining a suitable sanction.' " *White v. State Med. Bd. of Ohio*, 10th Dist. No. 23AP-587, 2024-Ohio-1553, ¶ 21, quoting *Macheret v. State Med. Bd. of Ohio*, 10th Dist. No. 09AP-848, 2010-Ohio-3483, ¶ 27. Banker was disciplined for his improper treatment of patients and his lack of required documentation regarding that treatment, and the Board's notice of his right to hearing amply describes the situations in which these concerns arose. (Record of Proceedings, State's Ex. 23a; Decision and Jgmt. Entry Affirming the Order of the State Med. Bd. at 1.) The court rejected this precise argument on very similar facts in *De Bourbon v. State Med. Bd. of Ohio*, 10th Dist. No. 17AP-769, 2018-Ohio-4682, ¶ 38:

> We disagree that the board's statement regarding appellant practicing outside his area of expertise and training necessarily required it to formally allege a violation in this respect. Initially, this paragraph expresses the board's general view of the case and is not a basis for any particular finding, although it was included under the sanction section. Notwithstanding, appellant fails to direct us to any authority for the proposition that the board cannot comment on issues or facts that touch on or relate to violations on which the board took no action. That the board decided not to take action on a violation of Ohio Adm.Code 4731-25-03 does not mean the board could not discuss evidence or draw conclusions related to the same subject matter included in that section. The nature of the board's statement was not in the form of a formal allegation but

> was a conclusion based on the evidence adduced to prove the charged violations. Indeed, appellant testified as to his training, experience, and credentials at the hearing, and we see no reason why the board could not use this testimony to draw related conclusions. Therefore, we find this argument without merit and overrule appellant's second assignment of error.

This analysis remains persuasive to us, and we see no reason to depart from it. Banker's first assignment of error is overruled.

{¶ 17} In Banker's second assignment of error, he contends that the Board "unlawfully converted its disagreement with [an expert's] report into evidence to support its Order * * * [because that] was the only evidence the Board had to support its Order." (Brief of Appellee at 26-27.)   But as the state correctly observes, Banker stipulated to that expert report and did not object to the report or the conclusions, and given that the entirety of the evidence in the record *also* supports the Board's order, we find Banker's contentions here puzzling at best. It seems that Banker is again simply attempting to challenge the *Pons* rule that "the medical board is * * * capable of determining when conduct falls below the minimum standard of care." *Yoonessi* at ¶ 7. And while Banker may wish to make all "standards of care" determinations into legal questions subject to de novo review, it is both obvious and axiomatic that judges are not trained to understand medical care better than doctors. Banker's second assignment of error therefore lacks merit.

{¶ 18} Banker's third assignment of error contends that there is no evidence upon which the Board could rely to conclude that he violated the standards of care or inappropriately prescribed medications.  But this argument relies upon Banker's own unclean hands—the very reason that there is not much evidence regarding the standard of his patients' care is because his patient documentation was inadequate, just as alleged in the notice and as Banker essentially admitted at his hearing. It was not an abuse of discretion for the trial court to permit the Board to draw an adverse inference from Banker's own lack of evidence of a diagnosis to support the treatment he provided.  This assignment of error lacks merit.

{¶ 19} Banker's fourth assignment of error relates to the "HRT patients," and argues that he was not subject to the same minimal standard of care as an endocrinologist when prescribing HRT because the expert witness here was an endocrinologist and Banker is not, and that he is therefore not a "similar practitioner[] under the same or similar

circumstances." R.C. 4731.22(B)(6). We disagree. We believe the state's response, that "once [Dr. Banker] elected to practice [in the areas of HRT and] endocrinology, he became an endocrinologist – just a very poor one," to be a better statement of how this law works. (Brief of Appellee at 17.) Banker's own voluntary choice to practice with his limited training cannot provide him an excuse to treat patients below the minimum standard of care. *See De Bourbon* at ¶ 37-38 (death of patient during office-based liposuction violated minimal standard of care, and was a "textbook example of what can happen when a physician practices outside his own specialty area without having adequate training and experience and does not know his own limitations").

{¶ 20} Banker's fifth assignment of error contends that the trial court erred by "affirming the Board's Order based on the Court's erroneous conclusion that Dr. Banker admitted" that his prescribing to the HRT patients was below the minimum standard of care. The challenged statement is as follows:

> With regard to the sufficiency of evidence supporting the Board's Order, it is also important to note that Dr. Banker himself admitted that *his prescribing of medications to the HRT patients* was in violation of Board rules and below minimal standards of care. * * * As set forth in detail above, Dr. Banker's expert, Dr. [Nosson] Goldfarb, likewise conceded that there were standard of care violations in treatment of the HRT patients.

(Emphasis added.) (Decision and Jgmt. Entry Affirming the Order of the State Med. Bd. at 11.) But as the record reveals, Banker did in fact admit that he prescribed phentermine for four of the patients described in this case, that he was "out of line" in making those prescriptions, and that he did not know the Board's rules at the time he issued those prescriptions. (Record of Proceedings at 140; Notice of Appeal, Ex. A at ¶ 51-53.) Banker has therefore misinterpreted the trial court's statement. Banker's "prescribing of medications to the HRT patients" was a violation of the standard of care, insofar as he misprescribed medications to four of the nine HRT patients, and admitted that at least some of these prescriptions were against the Board's prescribing rules. (Decision and Jgmt. Entry Affirming the Order of the State Med. Bd. at 11.) Although it is true that Banker did not admit misprescribing medications to all of the HRT patients, based on the record, we cannot say that the trial court's statement is even erroneous, let alone an abuse of that court's discretion.

{¶ 21} For the foregoing reasons, Banker's five assignments of error are overruled and the judgment of the Franklin County Court of Common Pleas is accordingly affirmed.

*Judgment affirmed.*

MENTEL, P.J., and LELAND, J., concur.

———————————